**John H. CARNES, Appellant,**

v.

**UNITED PARCEL SERVICE, INC.; Local Union No. 710, International Brotherhood of Teamsters, Appellee.**

No. 94–2633.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1994.

Decided March 16, 1995.

Michael J. McCarthy, Davenport, IA, argued, for appellant.

Kenneth L. Butters, Des Moines, IA, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge; HEANEY, Senior Circuit Judge; and BARNES,* District Judge.

HEANEY, Senior Circuit Judge.

After an unsuccessful grievance proceeding, John H. Carnes, a United Parcel Service (UPS) employee, brought this action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against Local 710, International Brotherhood of Teamsters (Local 710) for breach of duty of fair representation and against UPS for breach of collective bargaining agreement. The case was removed to the District Court for the Southern District of Iowa. That court granted summary judgment in favor of UPS and Local 710. Carnes raises two issues on appeal: (1) whether the district court erred in concluding as a matter of law that Local 710 did not breach its duty of fair representation when it waived a local grievance hearing provided for in a collective bargaining agreement, and (2) whether the court erred in concluding as a matter of law that Carnes' offense was of such "extreme seriousness" as to warrant discharge. Finding neither claim to be meritorious, we affirm.

* The Honorable Harry F. Barnes, District Judge for the Western District of Arkansas, sitting by designation.

The facts of this case are clear and largely undisputed. Carnes was employed by UPS as a parcel delivery driver at its Davenport, Iowa, facility for fourteen years until his discharge in 1993. In January 1993, while making deliveries at the Venture store in Davenport, one of the dock workers at the store, Torrin Mace, asked Carnes if he could acquire a UPS jacket similar to the one that Carnes had on. Carnes told him that he could not get a jacket for him, but that Pam Winters, a Venture store employee and former girlfriend of Carnes, had one and that he could get a jacket from Winters. The next day Mace told Carnes that Winters' jacket was too small and persisted in asking Carnes for a jacket. When Mace continued to inquire about the jacket, Carnes told him, "[I]f you can give me a blow job as good as Pam, I'll get you a coat." Jt.App. at 188.

According to Carnes, this sort of sexual banter was commonplace between him and the dock workers at the Venture store. Mace did not repeat the comment to Winters. He did, however, relay it to another coworker, Mark Nelson, who told Winters about the comment. Upon learning of the statement, Winters called a UPS customer complaint line to voice her concern. John Sullivan, the center manager for the terminal where Carnes worked, learned of the complaint the same day and summoned Carnes to his office the next morning to discuss it. Carnes admitted making the statement, explained that he was only joking and that he did not intend for Winters to hear about it. Sullivan told Carnes that the matter would be investigated and that he would be removed from service pending completion of the investigation.

Sullivan and another UPS official met with Winters, Mace, and Nelson at the store and obtained written statements from each of them. Their recollections of what happened and of Carnes' statement were consistent with Carnes' version of the events. The store manager told Sullivan that Carnes was barred from the property and would be arrested if he returned. Sullivan reported the

results of his investigation to his superiors in Des Moines, and the decision was made to terminate Carnes.

Sullivan and John McFadden, the shop steward, met with Carnes and told him that he was being terminated for the commission of an offense "of extreme seriousness." McFadden gave Carnes a grievance form and told him to file it as soon as possible.[1] He told Carnes that after he filed his grievance, the next step, pursuant to the collective bargaining agreement between Local 710 and UPS, would be a local hearing in Davenport within ten days of his discharge. If no agreement or compromise was reached at the local hearing, the matter would be reviewed by a Joint Grievance Committee (JGC) in Chicago. In the event that panel was deadlocked, the case would be heard by an arbitrator. *Id.* at 203–04.

After Carnes filed his written grievance, responsibility for representing him shifted from McFadden to Business Representative Robert Falco, a full-time Local 710 employee. UPS informed Falco that the company was standing firm on its decision to discharge Carnes and would not consider changing its position unless ordered to do so by the JGC. To expedite the matter and to avoid unnecessary disclosures that could later be used against Carnes, Falco agreed to waive the local hearing and have Carnes' case proceed directly to the JGC.[2] The JGC heard Carnes' case on February 11, 1993. Carnes testified that he made the statements attributable to him. After considering the case, the JGC denied Carnes' grievance. Carnes timely filed a petition in state court alleging that he had been discharged without good cause and had been denied a local hearing as provided for in the collective bargaining agreement. The defendants removed the case to federal court, which granted summary judgment in their favor.

1. McFadden did not conduct an investigation of his own because he did not believe that an investigation would be fruitful given Carnes' admission.

2. Falco also made no investigation as he concluded the facts were not in dispute and there was nothing to investigate.

## I.

On appeal Carnes argues that Local 710 acted arbitrarily by agreeing to waive the local-level hearing as provided for in Article 16 of the collective bargaining agreement, and thus breached its duty of fair representation. Article 16 of the agreement provides that "[t]he Employer shall not discharge nor suspend any Employee without just cause." *Id.* at 92. It further provides that, although a warning notice shall be given to an employee before he is suspended or discharged, no notice need be given if the cause of suspension or discharge is "dishonesty, drinking of, or under the influence of alcoholic beverages or narcotics during the workday, personal possession or use of drugs . . . ." *Id.* In cases of discharge involving "offenses of extreme seriousness" a warning notice need not be given. *Id.* Appeals may be taken according to the following procedure:

> Appeal from discharge, suspension or warning notice must be taken within ten (10) days by written notice and a decision reached within thirty (30) days from the date of discharge, suspension or warning notice or at the next appropriate grievance panel. *In the case of discharge, a hearing at the local level will be held within ten (10) calendar days of the discharge, with the grievant, business agent, steward, division manager and center manager.*
>
> *A unanimous decision reached at this hearing, by all parties, will be final and binding.*

*Id.* (emphasis added). A separate but related article, Article 23, covering grievance and arbitration procedures provides that: "If [grievances][3] are not settled by the Employer and the Union through the UNITED PARCEL SERVICE 710 Grievance Committee, then an arbitrator shall be selected from a list of five (5) names to be furnished by the Federal Mediation and Conciliation Service . . . ." *Id.* at 93b.

3. A "grievance" is defined in Article 23 as "a controversy, complaint, misunderstanding or dispute arising as to interpretation, application or observance of any of the provisions of this [collective bargaining] Agreement." Jt.App. at 93a.

Because Article 16 clearly provides that in the case of discharge a hearing at the local level will be held within ten calendar days of the discharge, Carnes argues the union's waiver of his right to a local hearing was arbitrary. The main premise of his argument is simple enough. The reasoning he employs to reach his intended result is a bit more convoluted. Carnes argues that his right to a local hearing is critical because, according to his understanding of the collective bargaining agreement, a nonunanimous decision at the local level would result in his case being directly reviewed by a neutral arbitrator. Appellant's Br. at 23. Because, by his estimation, review of his case at the local hearing would likely not have produced a unanimous decision,[4] he would have been entitled to have his case reviewed by an arbitrator. Stated somewhat differently, Carnes argues that the collective bargaining agreement can only reasonably be read to mean that the local hearing referred to in Article 16 is not an intermediate panel but rather is the grievance committee referred to in Article 23.[5]

The language in the collective bargaining agreement is not a paradigm of clarity. Article 16, standing on its own, quite clearly provides that in the event of discharge a local hearing will be held within ten calendar days of the discharge with a unanimous decision being final and binding on all parties. Considered in conjunction with Article 23, however, the language becomes less clear. Article 23 provides that an arbitrator shall be selected to hear a grievance where the employer and the union, "through the UNITED PARCEL SERVICE 710 Grievance Committee," are unable to settle their differences. No mention is made as to whom the grievance committee is comprised of or precisely what the relationship between the grievance committee and the local hearing panel is.

The district court assumed that the collective bargaining agreement set forth "a multistep grievance mechanism" for dealing with discharged employees. *Carnes v. United Parcel Service, Inc., Local Union No. 710 Int'l Bhd. of Teamsters*, No. 3–93–CV–80075, slip op. at 2–3 [1994 WL 804527] (S.D.Iowa May 25, 1994). That is, the court read the agreement to mean that once the employee filed a written grievance, a local hearing would be scheduled within ten calendar days of the discharge. *Id.* at 3. If the matter was not unanimously resolved there, the union could present the matter to the JGC and, if not decided there, the parties would select an arbitrator to hear the case. *Id.* We believe that the court's interpretation is a correct reading of the collective bargaining agreement.

According to affidavits submitted to the court, the language in Article 16 referring to the use of a local hearing in cases of discharge was added to the agreement in 1990 at the request of Local 710. Previously the procedure for resolving differences under the agreement was an initial review of the grievance by the employee's center manager. If the grievance could not be settled, it would be heard by the JGC, which meets monthly.[6] The addition of a preliminary step—the local hearing—was agreed upon by the union and the company as a means of allowing for a more balanced and efficient disposition of grievances: If cases could be resolved at the local hearing level by persons other than just the center manager (who likely was involved in the discharge decision) and without need to proceed to the JGC level, discharges could be resolved more fairly and on a more timely basis. *See* Jt.App. at 284–85 (Affidavit of Robert Falco ¶ 13 (Mar. 11, 1994)).

■ We do not believe that the district court erred in concluding as a matter of law

---

4. As evidence of his contention that the local hearing would not have produced a unanimous decision, he notes that Falco, a member of the local hearing panel, "did not believe Carnes had committed acts of extreme seriousness warranting discharge, and presumably ... would have voted for Carnes." Jt.App. at 9.

5. At oral argument Carnes cited two reasons for this: (1) if a decision is unanimous at the local hearing, the review process ends there; and (2) the local hearing panel has the power to fashion relief such as back pay and reinstatement.

6. The JGC is comprised of two individuals appointed by UPS and two individuals appointed by Local 710. The two individuals appointed by UPS are from UPS districts other than the one from which the grievance arose. Similarly, the two appointees from Local 710 are business agents who were not previously involved in representation of UPS employees. Although members of the JGC panels are appointed by the union and the company, their responsibility is to decide the case fairly based on the facts and the agreement, not to act on behalf of the union or the company. *See* Jt.App. at 283 (Affidavit of Robert Falco ¶¶ 8–9 (Mar. 11, 1994)).

that Local 710 did not breach its duty of fair representation. We review the grant of summary judgment *de novo* and will affirm only if the record, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Allen v. United Transp. Union,* 964 F.2d 818, 820 (8th Cir.1992).

■ The Supreme Court in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), defined the duty of fair representation as follows:

> [A] Union [has] a statutory duty fairly to represent all ... employees, both in its collective bargaining ... and in its enforcement of the resulting collective bargaining agreement.... Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Id.* at 177, 87 S.Ct. at 910 (citations omitted). The Court further articulated the duty in *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), in which it held that the duty of fair representation is breached where the final product of the bargaining process "can be fairly characterized as so far outside a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.'" *Id.* at 78, 111 S.Ct. at 1136 (citation omitted). Thus, the standard for determining whether a union has breached its duty of fair representation is clear: "In evaluating whether union conduct is so arbitrary as to breach the duty of fair representation, so long as a union exercises its discretion in good faith and with honesty or purpose, a 'wide range of reasonableness must be allowed.'" *N.L.R.B. v. American Postal Wkrs. Union, Etc.,* 618 F.2d 1249, 1255 (8th Cir.1980) (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)); *see Minnis v. Interna-*

*tional Union, United Auto., Aerospace, Etc.,* 531 F.2d 850, 854 (8th Cir.1975) (unions possess substantial discretion in deciding which grievances to pursue); *Griffin v. International Union, United Auto., Aerospace & Agric. Implement Wkrs. of Am., UAW,* 469 F.2d 181, 183 (4th Cir.1972) ("A union may screen grievances and press only those that it concludes will justify the expense and time involved in terms of benefiting the membership at large."). Mere negligence, poor judgment, or incompetence are insufficient to establish a breach of the duty of fair representation. *N.L.R.B.,* 618 F.2d at 1255; *see Minnis,* 531 F.2d at 854 ("Even negligence or poor judgment in exercising [discretion to pursue grievances] will not expose a union to liability so long as it acts with 'complete good faith and honesty of purpose,' and not in a 'perfunctory manner.'") (citations omitted).

■ Affidavits submitted to the court indicate that Local 710 and management frequently agreed to forego the local level hearing when, as here, UPS concluded that it was unwilling to reconsider a discharge action and would only reinstate the employee if ordered to do so by the JGC.[7] Jt.App. at 286–87. Decisions on the part of Local 710 to waive the local hearing and proceed directly to the JGC level thus were common in cases where the company refused to budge from its position that discharge was the appropriate remedy for conduct by an employee. Although Article 16 does not expressly provide that the local hearing may be waived where there is no hope of reconciliation at the local level, we do not believe that the union's decision to waive the hearing and proceed directly to the JGC level adversely affected Carnes' right to have his case fairly and properly reviewed. There is no evidence that Local 710's decision to waive the local hearing was arbitrary, was made in bad faith, or was based on a discriminatory motive.[8] The union did not breach its duty of fair representation for agreeing to waive review of Carnes' case at the local hearing.

Carnes cites several other examples of arbitrary conduct by Local 710, none of which, either individually or collectively, supports his argument that it breached its duty of fair representation. We therefore turn to the

---

7. According to Falco, of the forty-five discharge cases that had been filed under the new (1990–1993) agreement, a local level hearing was held in only five cases. Affidavit Robert Falco ¶ 19 (Mar. 11, 1994).

8. This case thus is distinguishable from cases involving agreements to waive contractual provi-

issue of whether the district court erred in concluding as a matter of law that Carnes'' offense was of such "extreme seriousness" as to warrant discharge.

II.

The district court, we believe, properly ruled that Carnes did not have a sustainable claim of breach of contract against UPS. Carnes' grievance was handled before the JGC in accordance with the established principles of the parties. He was duly represented by the union before the Committee and was afforded all of his rights under the collective bargaining agreement. After hearing Carnes' testimony and considering all of the evidence, the JGC ruled that Carnes was properly terminated. Decisions of arbitrators or joint arbitral panels are entitled to great deference. *Coca–Cola Bottling v. Teamsters Local 688*, 959 F.2d 1438, 1440 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 559 (8th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991). Recognizing the "strong policy favoring judicial enforcement of collective-bargaining contracts," *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976), courts generally will not "undertake to review the merits of arbitration awards, but [will] defer to the tribunal chosen by the parties ... to settle their damages." *Id.* at 562, 96 S.Ct. at 1055; *see United Paperworkers Int'l Union v. Misco,* 484 U.S. 29, 36, 108 S.Ct. 364, 369, 98 L.Ed.2d 286 (1987) ("As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate.") (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). The district court

did not err in finding in favor of UPS on the breach of contract claim.

Because the district court properly granted summary judgment in favor of Local 710 and UPS, its decision is affirmed.[9]

---

sions, which on their face lack good faith and honesty of purpose. *See Emmanuel v. Omaha Carpenters Dist. Council,* 560 F.2d 382, 285 (8th Cir.1977).

9. We have reviewed UPS' request for attorney's fees and other expenses, and we deny it.